## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

**JOSHUA T. L. DAVIS**

        Plaintiff,

v.                          Civil Action No.   3:19cv361  

**FIRST ADVANTAGE BACKGROUND
SERVICES CORP.**
Please Serve:
Corporation Service Company
100 Shockoe Slip, 2nd Floor
Richmond, Virginia 23219
Registered Agent,

**TPUSA, INC. d/b/a
TELEPERFORMANCE USA**
Please Serve:
5295 South Commerce Drive
Suite 600
Murray, Utah 84107,

        Defendants.

### COMPLAINT

Now comes the Plaintiff, Joshua T.L. Davis ("Mr. Davis"), by counsel, and sets forth to the Court the following:

### I.      Preliminary Statement

1. This is an action for actual, statutory, and punitive damages, costs, and attorney's fees pursuant to 15 U.S.C. § 1681 *et seq.* (the federal Fair Credit Reporting Act – "FCRA").

### II.      Jurisdiction

2. This Court has jurisdiction as to this case under the provisions of 15 U.S.C. § 1681(p), and 28 U.S.C. § 1331.

### III.   Parties

3.     Mr. Davis is a natural person who resides in Hopewell, Virginia. Mr. Davis is a "consumer" as protected and governed by the FCRA.

4.     First Advantage Background Services Corp. ("First Advantage") is a for-profit corporation doing business in the Commonwealth of Virginia. First Advantage is a "consumer reporting agency which [for the purposes of furnishing consumer reports] for employment purposes [. . .] compiles and reports items of information on consumers which are matters of public record and are likely to have an adverse effect upon a consumer's ability to obtain employment[.]" 15 U.S.C. § 1681k(a).

5.     TPUSA, Inc. d/b/a Teleperformance USA ("TPUSA") is a for-profit corporation doing business in the Commonwealth of Virginia.

### IV.   Venue

6.     Venue is proper in this Court because Mr. Davis resides in this District and Division, and a significant part of Mr. Davis' claims occurred in this District and Division.

### V.   Facts

*Applicable to All Counts*

7.     In May 2017, Mr. Davis graduated from Virginia State University with a Bachelor of Science Degree in Hospitality Management.

8.     In early October 2017, Mr. Davis sought employment with TPUSA in Richmond, Virginia.

9.     On October 13, 2017, Mr. Davis went to TPUSA's Richmond Office (the "Richmond Office") and completed an interview process with a TPUSA representative.

10.    As part of the interview process, Mr. Davis provided TPUSA with his Social Security number.

11.     As part of its hiring process, TPUSA uses employment-purpose consumer reports (commonly called "background reports" or "background checks") to make employment decisions.

12.     TPUSA ordered a background report on Mr. Davis from First Advantage on or about October 13, 2017.

13.     TPUSA purchases its background reports from First Advantage. In addition to performing background services for TPUSA, First Advantage also "grades" or "adjudicates" the report results, assigning grades of "Eligible," "Ineligible," or "Review" (or labels similar) after comparing the background report results to hiring criteria TPUSA provides to First Advantage.

14.     TPUSA offered Mr. Davis employment on October 13, 2017, contingent on a satisfactory background report. The employment offer was made in writing, and it provided an employment start date of October 30, 2017. Mr. Davis and a representative of TPUSA signed and dated the written employment offer.

15.     Between October 13, 2017 and October 30, 2017, Mr. Davis received no correspondence from TPUSA or First Advantage.

16.     On October 30, 2017, Mr. Davis arrived at TPUSA's Richmond Office at 7:30 a.m. for his first day of employment. Upon arrival, Mr. Davis was instructed to sit with the other new employees and wait for his name to be called. As each new employee was called, they were given an employment badge. When Mr. Davis' name was called out, he was told to wait and talk with a TPUSA employee (the "October 30 TPUSA employee").

17.     Eventually, the October 30 TPUSA employee showed Mr. Davis a copy of a completed background report (the "First Background Report") from First Advantage, and told him

TPUSA would be unable to hire him because of information contained in the First Background Report.

18.     Before speaking with the October 30 TPUSA employee, Mr. Davis had never seen the First Background Report or any background report prepared by First Advantage for TPUSA.

19.     The First Background Report contained inaccurate and extremely derogatory information. The First Background Report stated that Mr. Davis had been convicted of three felonies and a misdemeanor, i.e. aggravated battery peace Officer (felony), possess/use firearm (felony), aggravated discharge firearm vehicle/school (felony), and domestic battery/bodily harm (misdemeanor).

20.     Mr. Davis has never been convicted of any of the crimes attributed to him on the First Background Report.

21.     The criminal history attributed to Mr. Davis by First Advantage belonged to a different "Joshua Davis" who shares the same birthdate as Mr. Davis.

22.     At all times relevant to this case, if First Advantage had done a simple online search, it could have obtained confirmation that Mr. Davis was not the "Joshua Davis" incarcerated at Dixon Correctional Center in Illinois from April 14, 2016 until his parole date in March 2019.

23.     The First Background Report included a "Score Result" that listed Mr. Davis as being "ineligible" for employment with TPUSA.

24.     While examining the First Background Report with the October 30 TPUSA employee, Mr. Davis vigorously disputed the accuracy of the First Background Report, stating that the criminal history First Advantage attributed to him was inaccurate. Additionally, Mr. Davis

noticed that the Social Security number listed for him on the First Background Report was also incorrect and told the October 30 TPUSA employee about that issue.

25.    Upon hearing Mr. Davis' verbal disputes, the October 30 TPUSA employee responded to Mr. Davis that he would have to dispute the criminal history reporting with First Advantage.

26.    After talking with the October 30 TPUSA employee, Mr. Davis was instructed to leave the Richmond Office as TPUSA could not hire him based on the criminal history in the First Background Report and to dispute the criminal history reporting with First Advantage.

27.    Mr. Davis was not provided a copy of the First Background Report by TPUSA before he left the Richmond Office on October 30, 2017.

28.    That same day, Mr. Davis called First Advantage's dispute line and informed them of the false criminal history reporting and the incorrect Social Security number on the First Background Report. This was Mr. Davis' first dispute with First Advantage. In response, rather than initiating an investigation of the disputed criminal history reporting as required by the FCRA, the First Advantage representative told Mr. Davis that the inaccurate information must have been caused by incorrect identifying information in TPUSA's system and to go back to TPUSA and correct it.

29.    On October 31, 2017, Mr. Davis went back to the Richmond Office and informed TPUSA of his conversation with First Advantage the previous day. Mr. Davis and a TPUSA employee (the "October 31 TPUSA employee") then examined the identifying information and noticed that the Social Security number TPUSA gave to First Advantage was indeed incorrect. After fixing the Social Security number and requesting a new background report from First Advantage, the October 31 TPUSA employee again offered Mr. Davis

employment with TPUSA, contingent on a satisfactory background report. The employment offer was made in writing, and it provided an employment start date of November 13, 2017. Mr. Davis and the October 31 TPUSA employee signed and dated the written employment offer.

30.     Mr. Davis returned to the Richmond Office at 7:30 a.m. on November 13, 2017. When he arrived, a TPUSA employee presented him with a new background report (the "Second Background Report") prepared by First Advantage.

31.     Although the Second Background Report listed Mr. Davis' correct Social Security number listed, it contained the same inaccurate criminal history attributed to Mr. Davis in the First Background Report.

32.     After examining the Second Background Report, Mr. Davis told a TPUSA employee that the criminal charges attributed to him by First Advantage were incorrect. The TPUSA employee told Mr. Davis he would have to dispute the criminal history reporting with First Advantage again and instructed Mr. Davis to leave the Richmond Office because he was not eligible for employment.

33.     After leaving the Richmond Office, Mr. Davis had multiple phone calls with TPUSA and First Advantage to obtain correction of the false criminal history reporting.

34.     Finally, after numerous phone calls, a representative of First Advantage acknowledged errors in the First Background Report and Second Background Report and advised Mr. Davis that his disputes would be escalated to a supervisor but that it might take up to two weeks to have the situation resolved. This telephone call constituted, at the least, Mr. Davis' second dispute to First Advantage.

35.     In November 2017, Mr. Davis received a letter from First Advantage, dated November 13, 2017 (the "First Advantage November 13 Letter").

36.     The First Advantage November 13 Letter stated that First Advantage was reporting public record information about Mr. Davis to TPUSA. The First Advantage November 13 Letter enclosed a background report prepared by First Advantage which falsely attributed an extremely derogatory criminal history to Mr. Davis. The background report enclosed with the First Advantage November 13 Letter listed Mr. Davis as "ineligible" for employment with TPUSA, based on the false criminal history reporting by First Advantage.

37.     The First Advantage November 13 Letter also stated, "[t]he results are not an indication of an acceptance or a rejection of your employment or service." This statement was false. TPUSA made the decision to deny Mr. Davis employment when First Advantage prepared a background report listing Mr. Davis as "ineligible."

38.     In November 2017, Mr. Davis received a letter from TPUSA, dated November 13, 2017 (the "TPUSA November 13 Letter").

39.     The TPUSA November 13 Letter stated that TPUSA received information about Mr. Davis in a background report prepared by First Advantage that might adversely affect Mr. Davis' employment status. The TPUSA November 13 Letter enclosed a background report prepared by First Advantage which misattributed an extremely derogatory criminal history to Mr. Davis.

40.     The TPUSA November 13 Letter also stated, "[w]e will evaluate the information in your report on an individualized case-by-case basis in accordance with the law and EEOC guidance." This statement was false. TPUSA made the decision to deny Mr. Davis employment when First Advantage prepared a background report listing Mr. Davis as

"ineligible." First Advantage prepared and sent the TPUSA November 13 Letter as agent for TPUSA.

41.   On December 28, 2017, Mr. Davis received a call from an employee of TPUSA. This employee asked Mr. Davis if First Advantage had contacted him regarding his background report. Mr. Davis responded that he had not been contacted by First Advantage. The TPUSA employee then told Mr. Davis to call First Advantage the next day and inquire on the status of his background report.

42.   On December 29, 2017, Mr. Davis called First Advantage to inquire about the status of his background report and prior disputes. An employee of First Advantage told Mr. Davis that First Advantage's investigation of his prior disputes was not complete and that he would have to wait up to an additional thirty days for the dispute to be resolved.

43.   In January 2018, Mr. Davis received a letter from TPUSA, dated January 10, 2018 (the "January 10 Letter")

44.   The January 10 Letter stated that TPUSA received information about Mr. Davis in a background report prepared by First Advantage that might adversely affect Mr. Davis' employment status. The January 10 Letter enclosed a background report prepared by First Advantage which attributed an extremely derogatory criminal history to Mr. Davis (the "Third Background Report"). The Third Background Report listed Mr. Davis as "ineligible" for employment with TPUSA, based on the false criminal history reporting by First Advantage.

45.   The January 10 Letter also stated, "[w]e will evaluate the information in your report on an individualized case-by-case basis in accordance with the law and EEOC guidance." This statement was false. TPUSA made the decision to deny Mr. Davis employment when First

Advantage prepared the Third Background Report listing Mr. Davis as "ineligible." First Advantage prepared and sent the January 10 Letter as agent for TPUSA.

46.     Later in January 2018, Mr. Davis received a rejection letter from TPUSA, dated January 19, 2018 (the "January 19 Letter").

47.     The January 19 Letter stated, in part, that TPUSA's decision to not hire Mr. Davis was "based in whole or in part on information about you contained in a Consumer Report received from First Advantage." In fact, TPUSA's decision to deny Mr. Davis employment arose solely from the false criminal history contained in the Third Background Report.

48.     After reviewing the January 19 Letter, Mr. Davis called First Advantage's dispute line and asked why First Advantage was still erroneously reporting a false criminal history for him. The First Advantage employee speaking with Mr. Davis told him that First Advantage had no record of any disputes made by Mr. Davis or any escalations of those disputes to First Advantage supervisors. Mr. Davis then explained the full history of the two previous disputes he made to First Advantage. The First Advantage employee responded that a supervisor was not currently available to speak to Mr. Davis but that a supervisor would call Mr. Davis back. This was, at the least, Mr. Davis' third dispute with First Advantage.

49.     On or about January 25, 2018, Mr. Davis received a call from an employee of First Advantage. This employee told Mr. Davis that First Advantage had received his most recent dispute and the dispute would be escalated and resolved within twenty days.

50.     On January 31, 2018, Mr. Davis received a call from a TPUSA human resources employee (the "HR employee"). The HR employee told Mr. Davis that TPUSA wanted Mr. Davis to come work for TPUSA and asked if he was still interested. Mr. Davis told the HR employee the First Advantage dispute was not yet resolved. The HR employee responded by saying

that First Advantage might have completed processing of the dispute and not told Mr. Davis yet, so Mr. Davis should come to the Richmond Office right away.

51. When Mr. Davis arrived at the Richmond Office on January 31, 2018, the HR employee again offered Mr. Davis employment with TPUSA, contingent on a satisfactory background report. The employment offer was made in writing, and it provided an employment start date of February 12, 2018. Mr. Davis and the HR employee signed and dated the written employment offer.

52. The HR employee then advised Mr. Davis to return to the Richmond Office on February 12, 2018.

53. On February 9, 2018, Mr. Davis received a telephone call from the HR employee telling him that TPUSA received an updated background report that did not contain the criminal charges previously attributed to Mr. Davis by First Advantage.

54. Mr. Davis arrived at the Richmond Office on February 12, 2018 for training, and a TPUSA employee showed Mr. Davis a new background report (the "Fourth Background Report") prepared by First Advantage. The Fourth Background Report contained the same inaccurate criminal history attributed to Mr. Davis in the First Background Report, Second Background Report, and Third Background Report.

55. After reviewing the Fourth Background Report, Mr. Davis sought out TPUSA's Director of Employee Intake (the "Director") and was able to speak to her. Mr. Davis explained to the Director that he received a call from the HR employee on February 9, 2018 to advise him that he had a "clean" background report. The Director told Mr. Davis that TPUSA could not hire Mr. Davis because of criminal history reflected on the Fourth Background Report.

56.     The Director then explained to Mr. Davis that TPUSA had received the Fourth Background

        Report from First Advantage sometime between February 9, 2018 and February 12, 2018.

        She further explained that TPUSA policy required consideration of the Fourth Background

        Report to determine employment eligibility for Mr. Davis because the Fourth Background

        Report was the most recent background report prepared by First Advantage.

57.     After talking with the Director, Mr. Davis left the Richmond Office.

58.     On or about February 16, 2018, First Advantage sent a letter to Mr. Davis (the "February

        16 Letter"), stating, in part:

        You recently disputed information contained in a background report produced by First
        Advantage for an employment or volunteer purpose. We have completed our
        reinvestigation of the disputed information and the disputed information in your consumer
        report has been revised. A copy of the revised report reflecting the current information is
        enclosed for your records.

        The background report enclosed with the February 16 Letter did not contain the criminal

        charges previously misattributed to Mr. Davis by First Advantage.

59.     On or about February 21, 2018, First Advantage sent a letter to Mr. Davis (the "First

        Advantage February 21 Letter") stating that it was reporting public record information

        about Mr. Davis to TPUSA. The First Advantage February 21 Letter included a background

        report (the "Fifth Background Report") reflecting the same inaccurate criminal history

        attributed to Mr. Davis in the First Background Report, Second Background Report, Third

        Background Report, and Fourth Background Report and an accurate listing for a

        misdemeanor conviction for driving on a suspended license. The Fifth Background Report

        reflected that the misdemeanor conviction did not adversely affect Mr. Davis' eligibility

        for employment with TPUSA but that the misattributed criminal history rendered Mr.

        Davis ineligible for employment with TPUSA.

60.     On or about February 21, 2018, TPUSA sent Mr. Davis a letter (the "TPUSA February 21 Letter") stating that TPUSA received information about Mr. Davis in a background report prepared by First Advantage that might adversely affect Mr. Davis' employment status. The TPUSA February 21 Letter enclosed a copy of the Fifth Background Report.

61.     The TPUSA February 21 Letter also stated, "[w]e will evaluate the information in your report on an individualized case-by-case basis in accordance with the law and EEOC guidance." This statement was false. TPUSA had already made its decision to deny Mr. Davis employment as soon as First Advantage prepared the Third Background Report listing Mr. Davis as "ineligible." First Advantage prepared and sent the TPUSA February 21 Letter as agent for TPUSA.

62.     On February 22, 2018, Mr. Davis received a call from an employee of TPUSA. This employee stated to Mr. Davis that TPUSA had received an "updated" background report from First Advantage that did not attribute criminal charges to Mr. Davis and asked Mr. Davis if he was willing to return to TPUSA for employment.

63.     Mr. Davis agreed to return to TPUSA for employment and then again traveled to the Richmond Office, signing another written employment offer. The employment offer signed by Mr. Davis provided an employment start date of February 26, 2018.

64.     Mr. Davis arrived at the Richmond Office on February 26, 2018 for training, and a TPUSA employee told Mr. Davis that he could not start training as TPUSA had received another background report from First Advantage attributing an extremely derogatory criminal history to Mr. Davis. Mr. Davis then left the Richmond Office.

65.     On or about February 28, 2018, TPUSA sent a rejection letter to Mr. Davis (the "February 28 Letter").

66. The February 28 Letter stated, in part, that TPUSA's decision to deny Mr. Davis employment was "based in whole or in part on information about you contained in a Consumer Report received from First Advantage." In fact, TPUSA's repetition of its prior decisions to deny Mr. Davis employment arose solely from the inaccurate contents of the Fifth Background Report.

67. On March 16, 2018, Mr. Davis sent a dispute letter to First Advantage via Certified Mail (the "First Dispute Letter"). First Advantage received that dispute letter on March 23, 2018. Mr. Davis never received a response to the First Dispute Letter, which constituted, at the least, Mr. Davis' fourth dispute to First Advantage.

68. On or about May 9, 2018, Mr. Davis sent a second dispute letter to First Advantage via Certified Mail (the "Second Dispute Letter"), requesting a response to his First Dispute Letter.

69. In or around June 2018, First Advantage sent a letter to Mr. Davis (the "First Advantage June 2018 Letter"), stating, in part:

> You recently disputed information contained in a background report produced by First Advantage for an employment or volunteer purpose. We have completed our reinvestigation of the disputed information and the disputed information in your consumer report has been revised. A copy of the revised report reflecting the current information is enclosed for your records.

The background report enclosed with the First Advantage June 2018 Letter did not contain the criminal charges previously misattributed to Mr. Davis by First Advantage.

**Count One – Violations of the Federal Fair Credit Reporting Act
(15 U.S.C. § 1681e(b)) – Suit Against First Advantage for Statutory,
Compensatory, and Punitive Damages and for Attorney's Fees and Costs**

70. Mr. Davis re-avers and incorporates all other factual allegations set forth in this Complaint.

71. As a nationwide consumer reporting agency ("CRA"), First Advantage is obligated to meet

certain requirements of the FCRA. Pertinent here, CRAs like First Advantage must utilize reasonable procedures designed to ensure the maximum possible accuracy of the information they report. 15 U.S.C. § 1681e(b).

72. First Advantage provided to TPUSA multiple background reports that contained inaccurate criminal history regarding Mr. Davis. First Advantage reported to TPUSA that Mr. Davis had been convicted of three very serious felonies and a misdemeanor for domestic battery/bodily harm when that was not true.

73. First Advantage continued to provide background reports to TPUSA with false information regarding Mr. Davis even after it claimed to have removed such false information from its reporting on Mr. Davis.

74. The derogatory and inaccurate criminal history that was in Mr. Davis' background reports had an adverse effect on Mr. Davis' ability to obtain employment with TPUSA.

75. If First Advantage had employed reasonable procedures to ensure the maximum possible accuracy of the information it included in its background reports regarding Mr. Davis, First Advantage's repeated false attribution of extremely serious criminal convictions to Mr. Davis would have been avoided.

76. First Advantage knew or should have known about its legal obligations under the FCRA. These obligations are well established in the plain language of the FCRA and in the promulgations of the Federal Trade Commission and Consumer Financial Protection Bureau.

77. First Advantage obtained or had available substantial written materials, which apprised it of its duties under the FCRA.

78. First Advantage had only to use the publicly available internet search of the Illinois

14

Department of Corrections (the "Offender Search") to confirm that its background reports regarding Mr. Davis were inaccurate. In fact, an Offender Search would have established that the "Joshua Davis" convicted of the crimes falsely attributed to Mr. Davis was incarcerated in Dixon Correction Center in Illinois at all times relevant to this case.

79.   Because a simple, publicly available internet search would have confirmed that Mr. Davis was never convicted of three felonies and a misdemeanor for domestic battery/bodily harm but First Advantage inaccurately reported the opposite, First Advantage failed to utilize reasonable procedures to ensure the maximum possible accuracy of the information in its background reports regarding Mr. Davis.

80.   As a proximate result of First Advantage's violations of 15 U.S.C. § 1681e(b), Mr. Davis suffered actual damages, including but not limited to: lost wages, embarrassment, humiliation, time and money to correct First Advantage's errors, loss of sleep, severe stress, and out of pocket costs.

81.   The violations by the First Advantage were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, First Advantage was negligent, which entitles Mr. Davis to recovery under 15 U.S.C. § 1681o.

82.   Mr. Davis is entitled to recover actual damages, statutory damages, punitive damages, costs, and attorney's fees from First Advantage in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**Count Two – Violations of the Federal Fair Credit Reporting Act**
**(15 U.S.C. § 1681i(a)(1)) – Suit Against First Advantage for Statutory,**
**Compensatory, and Punitive Damages and for Attorney's Fees and Costs**

83.   Mr. Davis re-avers and incorporates all other factual allegations set forth in this Complaint.

84.     On one or more occasions (including within the past two years), by example only and without limitation, First Advantage violated 15 U.S.C. § 1681i(a)(1) by failing to conduct reasonable reinvestigations to determine whether criminal history reporting disputed by Mr. Davis was inaccurate and delete the disputed criminal history reporting from Mr. Davis' file with First Advantage.

85.     First Advantage understood the nature of Mr. Davis' disputes regarding First Advantage's false criminal history reporting.

86.     On multiple occasions, Mr. Davis called First Advantage's dispute line to inform First Advantage the criminal history it included in his background report(s) did not belong to him. Further, Mr. Davis sent two dispute letters to First Advantage via Certified Mail.

87.     Beyond that, Mr. Davis informed First Advantage that it was listing wrong addresses for him in Illinois, and he sent First Advantage a copy of his driver's license and his Social Security card.

88.     Rather than conducting a reasonable reinvestigation regarding Mr. Davis' disputes, First Advantage chose to repeatedly regurgitate the same erroneous criminal history on Mr. Davis' background reports, well after the time expired for First Advantage to investigate Mr. Davis' first two disputes.

89.     Even after Mr. Davis made at least three disputes to First Advantage regarding the criminal history wrongly attributed to him *and* First Advantage claimed, in writing, to have corrected its false criminal history reporting, First Advantage re-reported to TPUSA that Mr. Davis had been convicted of three felonies and a misdemeanor for domestic battery/bodily harm.

90.     If First Advantage had simply contacted the furnisher of the public records, it could have

determined that the criminal history did not belong to Mr. Davis. Additionally, if First Advantage had compared the pictures on Mr. Davis' Driver's License and the inmate photograph of "Joshua Davis" available through the Offender Search, it could have further confirmed the veracity of Mr. Davis' disputes. In fact, it was impossible for Mr. Davis to have committed the crimes attributed to him *and* apply for a job with TPUSA in Richmond, Virginia because "Joshua Davis" was incarcerated during the entire period Mr. Davis sought employment with TPUSA.

91.    As a proximate result of First Advantage's violations of 15 U.S.C. § 1681i(a)(1), Mr. Davis suffered actual damages, including but not limited to: lost wages, embarrassment, humiliation, time and money to correct First Advantage's errors, loss of sleep, severe stress, and out of pocket costs.

92.    The violations by the First Advantage were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, First Advantage was negligent, which entitles Mr. Davis to recovery under 15 U.S.C. § 1681o.

93.    Mr. Davis is entitled to recover actual damages, statutory damages, punitive damages, costs, and attorney's fees from First Advantage in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

### Count Three - Violation of the Federal Fair Credit Reporting Act
### (15 U.S.C. § 1681i(a)(4)) – Suit Against First Advantage for Statutory, Compensatory, and Punitive Damages and for Attorney's Fees and Costs

94.    Mr. Davis re-avers and incorporates all other factual allegations set forth in this Complaint.

95.    First Advantage violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Mr. Davis.

96. As a proximate result of First Advantage's violations of 15 U.S.C. § 1681i(a)(4), Mr. Davis suffered actual damages, including but not limited to: lost wages, embarrassment, humiliation, time and money to correct First Advantage's errors, loss of sleep, severe stress, and out of pocket costs.

97. The violations by the First Advantage were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, First Advantage was negligent, which entitles Mr. Davis to recovery under 15 U.S.C. § 1681o.

98. Mr. Davis is entitled to recover actual damages, statutory damages, punitive damages, costs, and attorney's fees from First Advantage in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## Count Four - Violation of the Federal Fair Credit Reporting Act
### (15 U.S.C. § 1681i(a)(5)) – Suit Against First Advantage for Statutory, Compensatory, and Punitive Damages and for Attorney's Fees and Costs

99. Mr. Davis re-avers and incorporates all other factual allegations set forth in this Complaint.

100. First Advantage violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promply delete the disputed criminal history reporting from Mr. Davis' file with First Advantage or modify the disputed criminial history reporting upon a lawful reinvestigation.

101. First Advantage violated 15 U.S.C. § 1681i(a)(5)(B)(i) by reinserting inaccurate criminal history into Mr. Davis' consumer file after it had deleted that information without a furnisher of such information certifying that the information was complete and accurate.

102. First Advantage violated 15 U.S.C. § 1681i(a)(5)(B)(ii) by failing to notify Mr. Davis of the reinsertion of the inaccurate criminal history into his consumer file within five days of such reinsertion.

103.    First Advantage violated 15 U.S.C. § 1681i(a)(5)(C) by failing to maintain reasonable procedures to prevent the reappearance in Mr. Davis' consumer file, and in the background reports relating to Mr. Davis based on that consumer file, of the previously deleted criminal history reporting.

104.    As a proximate result of First Advantage's violations of 15 U.S.C. § 1681i(a)(5)(A), Mr. Davis suffered actual damages, including but not limited to: lost wages, embarrassment, humiliation, time and money to correct First Advantage's errors, loss of sleep, severe stress, and out of pocket costs.

105.    The violations by the First Advantage were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, First Advantage was negligent, which entitles Mr. Davis to recovery under 15 U.S.C. § 1681o.

106.    Mr. Davis is entitled to recover actual damages, statutory damages, punitive damages, costs, and attorney's fees from First Advantage in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**Count Five – Violation of the Federal Fair Credit Reporting Act**
**(15 U.S.C. § 1681k(a)(1)) – Suit Against First Advantage for Statutory,**
**Compensatory, and Punitive Damages and for Attorney's Fees and Costs**

107.    Mr. Davis re-avers and incorporates all other factual allegations set forth in the Complaint.

108.    When a CRA sells a background report for employment purposes and that report contains public record information that "is likely to have an adverse effect upon a consumer's ability to obtain employment," the FCRA mandates that the CRA take one of two actions:

    A.      Notify the consumer, "at the time" it provides the report to the user, that it is providing the report to the employer; 15 U.S.C. § 1681k(a)(1); or

B. Maintain strict procedures designed to insure that whenever public record information, which is likely to have an adverse effect upon a consumer's ability to obtain employment, is reported, it is complete and up to date. 15 U.S.C. § 1681k(a)(2).

109. Upon information and belief, First Advantage did not maintain strict procedures to ensure that the public record information it reported about Mr. Davis to TPUSA was complete and up to date. In fact, the errors in the background report First Advantage prepared on Mr. Davis demonstrates that First Advantage did not and does not consult or obtain the actual, complete and up to date public records.

110. Indeed, the inaccurate information First Advantage included in its background report prepared on Mr. Davis, upon information and belief, belonged to an entirely different person. Accordingly, the public record information could not be "complete" when it contained information that did not belong to Mr. Davis.

111. Accordingly, First Advantage was required to comply with the notice requirement in 15 U.S.C. § 1681k(a)(1).

112. First Advantage did not provide notice to Mr. Davis that it was supplying TPUSA with a background report which contained public records likely to have an adverse effect upon Mr. Davis' ability to obtain employment. First Advantage knew the public record would have an adverse effect upon Mr. Davis' ability to obtain employment because, by the criteria TPUSA gave First Advantage for scoring criminal history information, Mr. Davis was deemed "ineligible" for employment with TPUSA.

113. First Advantage's notice process does not achieve the result that the FCRA envisioned – employer and consumer both seeing the report at nearly the same time.

114.    Instead, upon information and belief, First Advantage provided background reports regarding Mr. Davis to TPUSA almost instantaneously over the Internet, while the notice letters that were supposed to go to Mr. Davis "at the time" First Advantage provided background reports to TPUSA regarding Mr. Davis were not provided to Mr. Davis until days or weeks later.

115.    The notice requirement is intended to provide consumers immediate notice of the furnishing of the background report and details necessary to preemptively contact the reporting agency to obtain, and as appropriate, correct information in the background report.

116.    The notice requirement is also intended to alert the consumer to the employer's use of the report to provide them with the opportunity to address any concerns or inaccurate and derogatory information in the background report directly with the employer.

117.    Mr. Davis never received the opportunity to preemptively review the derogatory information in the background reports prepared by First Advantage. Rather, on numerous occasions, he arrived at the Richmond Office and was greeted with a new background report he had never seen before. Mr. Davis did not receive the opportunity to dispute the inaccurate information in these reports or explain the errors to TPUSA before he was deemed "ineligible" for employment with TPUSA on several occasions.

118.    First Advantage's multiple violations of 15 U.S.C. § 1681k(a)(1) were willful.

119.    First Advantage knew or should have known about its legal obligations under the FCRA. These obligations are well established in the plain language of the FCRA and in the promulgation of the Federal Trade Commission.

120.    Despite knowing of these legal obligations, First Advantage acted consciously in breaching

its known duties and deprived Mr. Davis of his rights under the FCRA.

121.    The conduct, action, and inaction of First Advantage was uniform, as intended, and followed without a reasonable consideration of the risks that First Advantage may have violated the FCRA.

122.    As a proximate result of First Advantage's violations of 15 U.S.C. § 1681k(a)(1), Mr. Davis suffered actual damages, including but not limited to: lost wages, embarrassment, humiliation, time and money to correct First Advantage's errors, loss of sleep, severe stress, and out of pocket costs.

123.    The violations by the First Advantage were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, First Advantage was negligent, which entitles Mr. Davis to recovery under 15 U.S.C. § 1681o.

124.    Mr. Davis is entitled to recover actual damages, statutory damages, punitive damages, costs, and attorney's fees from First Advantage in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n & § 1681o.

### Count Six – Violation of the Federal Fair Credit Reporting Act (15 U.S.C. §1681b(b)(3)(A)) – Suit Against TPUSA for Statutory, Compensatory, and Punitive Damages and for Attorney's Fees and Costs

125.    Mr. Davis re-avers and incorporates all other factual allegations set forth in the Complaint.

126.    The FCRA provides that any person "using a consumer report for employment purposes" who intends to take any "adverse action based in whole or in part on the report," must provide the consumer to whom the report relates a copy of the consumer report and a written description of the rights of a consumer under the FCRA before taking such adverse action. 15 U.S.C. § 1681b(b)(3)(A).

127.    Under the FCRA, a "person" includes a corporation under 15 U.S.C § 1681a(a).

128.    An "adverse action" under 15 U.S.C. § 1681b(b)(3)(A) includes "any … decision for employment purposes … that adversely affects any … prospective employees." 15 U.S.C. § 1681a(k)(1)(B)(ii). Alternatively, an adverse action is an action taken or a determination that is made in connection with an employment application made by a consumer and adverse to the intrerest of the consumer within the meaning of 15 U.S.C. § 1681(k)(B)(iv).

129.    First Advantage was hired by TPUSA to go beyond the functions of a CRA to make determinations or judgments about hiring Mr. Davis.

130.    TPUSA contracted with First Advantage to perform background checks of prospective employees and to prepare background reports based on the information gathered by First Advantage regarding prospective employees of TPUSA. Upon information and belief, TPUSA gave First Advantage criteria for determining when a prospective employee would be deemed "ineligible" for employment. Based on the criteria TPUSA gave to First Advantage, First Advantage would analyze a prospective employees background report and determine whether that background report contained any information that TPUSA told First Advantage would render an employee "ineligible" to be hired.

131.    In essence, when First Advantage delivered its background reports on Mr. Davis to TPUSA that listed him as "ineligible," TPUSA's decision to deny Mr. Davis employment was already confirmed. No further action by TPUSA would be required as the background report First Advantage prepared for Mr. Davis contained information that TPUSA determined would make Mr. Davis "ineligible" for employment.

132.    TPUSA took "adverse action" against Mr. Davis as soon as First Advantage prepared each background report on Mr. Davis which listed him as "ineligible." TPUSA gave First

Advantage criteria for what public-records information would deem an employee "ineligible" for employment. Therefore, as soon as the words "ineligible" appeared on the background report, TPUSA would not hire Mr. Davis.

133. The fact that Mr. Davis and TPUSA met in person on multiple occasions does not negate the fact that TPUSA would refuse to hire Mr. Davis no matter what because, by TPUSA's own metrics, he was ineligible for employment as long as the inaccurate criminal history remained on his background report as prepared by First Advantage.

134. In fact, Mr. Davis' experience with TPUSA confirms TPUSA's absolute refusal to hire Mr. Davis based on criminal history criteria used by First Advantage to deem Mr. Davis' "ineligible" for employment with TPUSA. Even after TPUSA received a "clean" background report for Mr. Davis from First Advantage, TPUSA rejected Mr. Davis for employment because First Advantage produced a subsequent background report, i.e. the Fourth Background Report, that deemed Mr. Davis "ineligible" for employment with TPUSA based on false criminal history reporting.

135. As a proximate result of TPUSA's violations of 15 U.S.C. § 1681i(b)(3)(A), Mr. Davis suffered actual damages, including but not limited to: lost wages, embarrassment, humiliation, time and money to correct First Advantage's errors, loss of sleep, severe stress, and out of pocket costs.

136. The violations by TPUSA were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, TPUSA was negligent, which entitles Mr. Davis to recovery under 15 U.S.C. § 1681o.

137. Mr. Davis is entitled to recover actual damages, statutory damages, punitive damages, costs, and attorney's fees from TPUSA in an amount to be determined by the Court

pursuant to 15 U.S.C. § 1681n and § 1681o.

## VI.    Demand for Trial by Jury

138.    Mr. Davis demands trial by jury in this case.

## VII.    Conclusion

WHEREFORE, Mr. Davis prays that the Court enter a judgment for actual, statutory and punitive damages against the Defendants, jointly and severally; for his attorney's fees and costs; for pre-judgment and post-judgment interest at the judgment rate; and such other relief the Court deems just and proper.

Respectfully submitted,

**JOSHUA T. L. DAVIS**

By____/s/ Drew D. Sarrett_____
            Counsel

Drew D. Sarrett (VSB No. 81658)
Ian E. Vance (VSB No. 88062)
The Sarrett Law Firm, PLLC
8100 Three Chopt Road, Suite 203
Richmond, Virginia 23229
Phone: (804) 303-1951
Fax: (804) 250-6005
E-mail: drew@sarrettlawfirm.com
E-mail: ian@sarrettlawfirm.com
*Counsel for Plaintiff(s)*